**JOHN BREMOND CO. v. SCOFIELD, Collector of Internal Revenue.**

Civ. A. No. 491.

District Court of United States
W. D. Texas, Austin D.

June 1, 1951.

Dan Moody, Mac Umstattd, Austin, Tex.,
for plaintiff.

H. W. Moursund, U. S. Atty., San Antonio, Tex., for defendant.

RICE, Chief Judge.

This is an action to recover excess profits taxes for 1944 and income taxes for 1946 allegedly overpaid by plaintiff to defendant. There were originally four issues of the action:

(1) Whether or not money borrowed by plaintiff during 1944 for the purchase of World War II bonds was borrowed for business reasons and not merely to increase the excess profits credit as required by the provisions of Internal Revenue Code, Sec. 719(a) (1), 26 U.S.C.A. § 719(a) (1), and Treasury Regulation 112, Sec. 35.719–1 in determining borrowed capital for computing excess profits tax credit;

(2) Whether or not a certain instrument in the face amount of $2,445.98 executed by plaintiff in favor of one Edward Bock, Jr., secretary of plaintiff, was properly includible in plaintiff's borrowed capital;

(3) Whether or not $20,000 paid by plaintiff to its President, H. M. Houston, in 1946 was a reasonable compensation for the services actually rendered plaintiff by H. M. Houston during 1946 and was therefore an allowable deduction from plaintiff's gross income under the provisions of Internal Revenue Code Sec. 23 (a) (1) (A), 26 U.S.C.A. § 23(a) (1) (A) and Treasury Regulation 111 Sec. 29.23(a)–6;

(4) Whether or not $100 paid by plaintiff to the Sponsors of the Governor's Inaugural Ball in Austin, Texas was a necessary and ordinary business expense and therefore entitled to be deducted from plaintiff's gross income under the provisions of Internal Revenue Code Sec. 23 (a) (1) (A) and Treasury Regulation 111 Sec. 29.23(a)–1.

At the outset of the trial plaintiff abandoned issue No. (2) above and defendant conceded that the $100 paid to the Sponsors of the Governor's Ball under issue No. (4) was an allowable deduction. Trial was had solely on issues No. (1) and (3) above.

The court having considered the oral testimony, the stipulated facts, the exhibits and briefs of counsel, and being otherwise fully advised in the premises, makes and enters the following Findings of Fact and Conclusions of Law:

## Findings of Fact

1. Plaintiff is a Texas corporation with principal office and place of business and residence at 301 San Jacinto Street, Austin, Texas.

2. Plaintiff is a Texas corporation engaged in the wholesale grocery business in and around the City of Austin, Texas. Defendant is now, and has been continuously since November 21, 1933, Collector of Internal Revenue for the First District of Texas. He resides in Travis County, Texas.

3. On March 15, 1945, plaintiff filed with the defendant its corporate tax returns for the calendar year 1944 reporting therein;

| | |
|---|---|
| Gross Income | $205,674.03 |
| Net Income | 40,809.07 |
| Tax Liability | |
| Income tax and declared value excess profits tax | 12,004.78 |
| Excess Profits tax | 6,142.59 |

Said taxes were duly paid to defendant.

4. On the February, 1948, assessment list the Commissioner of Internal Revenue assessed against plaintiff additional excess profits taxes of $5,291.51 and interest thereon of $919.56, totaling $6,211.07. This liability was satisfied by a payment of $2,882.-31 to defendant on March 24, 1948, and by application of a credit in the amount of $3,328.76, on March 26, 1948, representing over-assessment of income taxes for 1944.

5. The assessment of additional excess profits taxes for the year 1944, referred to in finding 4 above, was based in part upon determination by the Commissioner that plaintiff, in computing its excess profits credit for the year 1944 by the invested capital method, was not entitled to include as part of its borrowed invested capital:

(a) The sum of approximately $200,000 in notes representing money borrowed to purchase United States War Bonds;

(b) The sum of $2,445.98 allegedly borrowed from an officer of the plaintiff corporation.

6. The portion of said additional assessed excess profits taxes allocable to the exclusion from plaintiff's borrowed capital of said $2,445.98 mentioned in Finding of Fact 5(b) is $112.67, concerning which amount, and the interest thereon, plaintiff abandoned suit as aforementioned.

7. On May 26, 1948, plaintiff filed with the defendant a claim for refund of 1944 excess profits taxes in the amount of $2,-882.31. This claim was formally rejected by the Commissioner of Internal Revenue on February 28, 1949.

8. On March 17, 1947, plaintiff filed with the defendant its corporate tax return for the calendar year 1946, reporting therein:

| | |
|---|---|
| Gross Income | $336,111.58 |
| Net Income | 113,639.76 |
| Tax Liability—Income Tax | 40,629.67 |

Said taxes were duly paid to the defendant.

9. On the May, 1949 assessment list the Commissioner of Internal Revenue assessed against plaintiff additional income tax of $1,499.31 and interest thereon of $196.14, totaling $1,695.45 for 1946, and said amount was paid to defendant on June 1, 1948.

10. The additional assessment for 1946 was based in part upon the following adjustments made by the Commissioner of Internal Revenue in plaintiff's returns for 1946:

(a) $100 deduction for contribution to Governor's Inaugural Ball at Austin, Texas —Disallowed

(b) $20,000 salary for president of plaintiff corporation during 1946—Reduced to $17,000

11. On June 8, 1949, plaintiff filed with defendant its claim for refund of 1946 tax, in the amount of $1,332.07. This claim had not been formally rejected by the Commissioner of Internal Revenue when this suit was instituted and more than six months elapsed between the filing of said claim and the filing of this suit.

### War Bond Issue

12. Plaintiff engaged in the following United States Government War Bond negotiations during World War II, numbers (6) through (11) of which are directly involved in this lawsuit:

(1) On September 18, 1942, plaintiff purchased $2,000 in Series G bonds bearing interest at 2½% out of the company's operating fund.

(2) On April 28, 1943, plaintiff purchased $3,000 in bonds maturing 1950–52, bearing 2% interest out of the same fund.

(3) On September 8, 1943, plaintiff purchased $5,000 in Series G bonds out of the same fund.

(4) On February 21, 1944, plaintiff purchased $10,000 in Series C bonds out of the same fund.

(5) On September 3, 1946, the bonds aforementioned in subsections 1, 2, 3 and 4 above, which bonds are not directly involved in this suit, were sold.

(6) On February 29, 1944, plaintiff borrowed $98,000 at 1½% interest from the Capital National Bank of Austin, Texas, and used such amount to purchase United States Government Bonds from said bank maturing 1951–53 and bearing 2% interest.

(7) On April 27, 1944, plaintiff borrowed $98,000 at 1½% interest from the Mercantile National Bank of Dallas and used such amount to purchase Government Bonds maturing 1951–53 and bearing 2% interest.

(8) On June 26, 1944, the bonds bought on February 29, 1944, were sold and additional bonds bought with the funds, which bonds matured 1942–54 and bore 2% interest.

(9) On June 28, 1944, the bonds bought on April 27, 1944, were sold and the funds used to purchase additional bonds, which matured 1952–54 and bore 2% interest.

(10) On November 29, 1944, H. M. Houston borrowed $200,000 at 1½% interest from the Capital National Bank and used such amount to purchase United States Government Bonds maturing 1952–54 and

bearing 2% interest. On the same date the plaintiff issued its note for $200,000 at 1½% interest to H. M. Houston for purchase of said bonds.

(11) On December 28, 1944, the bonds bought on June 26, 1944, June 28, 1944, and November 29, 1944, were sold and the notes involved satisfied. Plaintiff borrowed $200,000 at 1½% interest from said Capital National Bank and used such amount to purchase United States Government Bonds maturing 1952–54 and bearing 2% interest.

(12) On February 1, 1945, plaintiff borrowed $196,000 at 1½% interest from said Mercantile National Bank and used such amount to purchase United States Government Bonds maturing 1952–54 and bearing 2% interest.

(13) On June 18, 1945, plaintiff borrowed $192,000 at 1½% interest from said Mercantile National Bank and used such amount to purchase United States Government Bonds maturing 1967–72, and bearing 2½% interest.

(14) On June 29, 1945, the bonds bought on December 28, 1944, were sold, and the note involved satisfied. Plaintiff borrowed $200,000 at 1½% interest from said Capital National Bank and used such amount to purchase United States Government Bonds maturing 1967–72 and bearing 2½% interest.

(15) On July 30, 1946, plaintiff sold the bonds bought on February 1, 1945, and used the funds to purchase United States Government Bonds maturing 1967–72 and bearing 2½% interest.

(16) In the transactions covered by subparagraphs (6) through (15), the borrowings were evidenced by notes and the bonds were held as collateral for the loans.

(17) On November 12, 1946, plaintiff sold all of the above bonds still retained, amounting to approximately $600,000 and satisfied all notes involved.

(18) The reason plaintiff made the sale mentioned in Finding of Fact 12(17) was not that the excess profits credit was no longer in effect in 1946, but because during the war years orders for certain scarce commodities had been made by the plaintiff far in excess of what it needed in hopes of obtaining as much as possible; but late in 1946, when the armed forces were no longer drawing seriously on the supply of scarce items, such items, in answer to such excess ordering, were delivered by jobbers to the plaintiff far in excess of the plaintiff's ability to pay for such items, which financial crisis influenced plaintiff to sell bonds as heretofore mentioned in Finding of Fact 12(17) in order to strengthen its financial position.

13. Plaintiff profited to the following extent from said United States War Bond transactions:

| Years | Interest Gains | Market Gains |
|---|---|---|
| 1944 | $1,787.63 | $ 843.75 |
| 1945 | 6,048.06 | 6,250.00 |
| 1946 | 6,369.86 | 16,044.82 |
| Totals | $14,205.55 | $23,138.57 |

14. Mr. Hale M. Houston, President of plaintiff, under whose responsibility the money borrowed and the purchases made, in Finding of Fact 12(6)–(11), were negotiated, was aware of the possible future profit feature of said purchases when they were made because of his past experience in witnessing similar bond transactions as a member of the Board of Directors of the Capital National Bank in Austin, Texas, and this possibility of profit was one of the reasons said borrowings and bond purchases were made.

15. Prior to the program of borrowing and purchasing mentioned in Finding of Fact 12(6)–(11), Mr. Houston had used funds drawn from plaintiff's operating fund, which was comprised largely of money borrowed from various banks on which plaintiff paid 6% interest, to buy approximately $20,000 worth of various types of government bonds, paying a very much lower rate of interest. Because of this unfavorable interest differential, plaintiff suffered a loss in excess of $2,300 when it cashed these bonds in, and another reason the borrowings and bond purchases mentioned in Finding of Fact 12(6)–(11) were made was to eliminate further drain on plaintiff's funds, operating funds, borrowed

at a high rate of interest which resulted from purchasing bonds bearing a low rate of interest from such funds.

16. Plaintiff's grocery business has been operating in Austin, Texas, since 1847 and Mr. Houston has resided in Austin since 1907, was vice-president of plaintiff from 1919 to 1928 and has been president since 1928. Plaintiff enjoys an excellent business reputation in and around Austin, Texas, and another reason for making the borrowings and bond purchases mentioned in Finding of Fact 12(6)–(11) was to maintain and continue the business good will of the plaintiff within such community during war time.

17. Another reason for making the borrowings and bond purchases mentioned in Finding of Fact 12(6)–(11) was that the fact they had been made would prove helpful in advertising the plaintiff's business during the war period when bond buying was regarded with high favor among the public and possible purchasers.

18. A certain Louis Novy, Manager of the Interstate Theatres in Austin, Texas during all the times pertinent to this lawsuit was very active during World War II in bond drives in and around Austin, Texas, and regularly lent his motion picture theatre, the Paramount Theatre, to promote such drives. Motion picture stars came to Austin and put on shows to promote bond buying and such affairs were publicized and attracted much public attention. Mr. Novy was an important business customer of plaintiff and purchased candy from plaintiff in the amount of $17,917.28 in 1944, $17,725.26 in 1945 and $27,339.25 in 1946. Mr. Novy frequently visited Mr. Houston at his office during the time involved in this lawsuit and urged Mr. Houston to buy bonds through him. There was considerable competition among the different agencies that were working on the sale of War Bonds in the Austin area during such period. Another reason for making the borrowings and bond purchases mentioned in Finding of Fact 12 (6)–(11) was to maintain Mr. Novy's friendship and good will toward plaintiff's grocery business. Such friendship and good will was so maintained by Mr. Hous-

ton's giving Mr. Novy substantial war bond subscriptions in Mr. Novy's War Bond Campaigns during World War II.

19. In 1944 a meeting of some forty or fifty business men and executives was called in Austin, which meeting Mr. Houston attended. It was presided over by Mr. Frank Scofield, the defendant, who informed said business men and executives in very certain terms that the United States Government had to have money with which to continue the war effort and if said business men and executives didn't come through something was going to happen; however, Mr. Scofield did not state definitely what was going to happen. Another reason said borrowings and bond purchases mentioned in Finding of Fact 12(6)–(11) were made was that said appeal by Mr. Scofield to said business men and executives, and to them alone, made Mr. Houston fearful of unfavorable consequences to plaintiff's grocery business should plaintiff not make liberal War Bond purchases.

20. Said reasons for making said borrowings and bond purchases mentioned in Finding of Fact 12(6)–(11) as outlined in Findings of Fact 14 through 19 above were bona fide good faith reasons dictated by business considerations.

## Salary Issue

21. Plaintiff is a wholesale grocery corporation with its principal office and place of business, comprising a brick and concrete building 130 feet by 190 feet, located at 301 San Jacinto Street, Austin, Texas. The business was originated in 1847, incorporated in 1915, operates ten trucks, and employs forty-five people. It enjoys an excellent reputation in the community. The wholesale grocery business involved the purchasing of groceries in large amounts and selling them in smaller amounts to merchants, hotels, and eating places of all sorts. Mr. Hale M. Houston, during all times pertinent to this suit, was President of plaintiff and has been since 1928. He was vice-president of plaintiff from 1919, when he just came to work for plaintiff, until 1928. As vice-president Mr. Houston was the financial manager of

the business and took charge of borrowing money, making collections and supervising credits. During his tenure with the company Mr. Houston's efforts in the management of the credit program, handling of inventories, speeding up of collections, and negotiating loans from banks during times of stress have been instrumental in the success of the business. The wholesale grocery business is competitive and during Mr. Houston's tenure with plaintiff, three of the four competitors, which formerly did a larger business than plaintiff in and around Austin, Texas, have been eliminated. Mr. Houston served one year prior to 1946 as President of the South Texas Wholesale Grocers' Association.

22. Mr. Houston's duties and services rendered on behalf of plaintiff's grocery business during the year 1946 were as follows:

(1) He was president and general supervisory manager of everything that took place in the operation of plaintiff's grocery business and continued to handle and retain as his sole responsibility his former vice presidential duties in administering the financial phase of the business as described in Finding of Fact 21.

(2) He performed the difficult and exacting duty of preparing certain proposals submitted from time to time to various state and public institutions to solicit their grocery business. Such proposals required very heavy and very exacting preparation and Mr. Houston did much of the computation and work on such proposals at home after regular business hours and in addition to his regular duties at the plant during the daytime. The submitting of such proposals to state and public institutions was a highly competitive business. Only about a half dozen grocery jobbers in Texas competed because of the highly specialized nature of the business. The sales to state and public institutions in 1946 resulting from these proposals prepared and submitted entirely by Mr. Houston amounted to $97,264.24.

(3) Mr. Houston had under his supervision and direction a vice president, secre-

tary-treasurer, sales manager and total force of approximately 45 employees.

(4) In November 1946 he was faced with the unusual and serious conditions of business stress and financial crisis mentioned in Finding of Fact 12(18) with which difficult situation Mr. Houston was forced to cope in addition to his regular duties.

(5) In addition to his duties in supervising the operation of plaintiff's merchandizing business, Mr. Houston also administered the taking care of the physical plant and properties belonging to plaintiff, including such items as trucks.

23. During the taxable year 1946 plaintiff's net sales were $2,664,477.81, its net income before taxes was $113,639.76 and its net earnings after taxes were $71,876.35.

24. During the taxable year 1946 plaintiff paid a cash dividend of $32,500 and stock dividend of $150,000 and the company then became capitalized at $250,000.

25. During the following year, plaintiff reported cash dividends and gross sales in the following amounts:

| Year | Cash Dividend | Sales |
| --- | --- | --- |
| 1942 | $ 6,000.00 | $1,318,930.79 |
| 1943 | 8,000.00 | 1,533,443.92 |
| 1944 | 8,000.00 | 1,876,980.08 |
| 1945 | 15,000.00 | 1,930,633.08 |
| 1946 | 32,500.00 | 2,664,477.81 |

26. During 1946 all the employees of plaintiff's business received bonuses. It was a custom of the grocery business in 1946 in and about Austin, Texas to pay to grocery business employees a base salary with a bonus based on the experience of the employee. Mr. Houston's bonus during 1946 was 54% of his base salary, giving $13,000 base salary, $7,000 bonus, and total compensation of $20,000. The vice president's bonus was 33⅓ per cent of his base salary, the secretary-treasurer's bonus was 81% of his base salary, the sales manager's bonus was 103% of his base salary, and none of the sales manager's bonus was based on a commission arrangement or profit sharing plan. The bookkeeper's bonus was 58% of his base salary. None of these bonuses were correlated with the

amount of stock owned in 1946 by the bonus receiver.

27. The $20,000 paid Mr. Houston by plaintiff during the taxable year 1946 was paid to him in good faith as salary and compensation for services actually rendered plaintiff by Mr. Houston during 1946, and no part of such $20,000 payment to Mr. Houston was made in bad faith as an attempt to distribute corporate earnings of plaintiff.

28. Said $20,000 paid Mr. Houston by plaintiff during the taxable year 1946 was a fair, just and reasonable compensation for the services actually rendered to plaintiff during 1946 by Mr. Houston and such payment was made purely as compensation for such services as rendered by Mr. Houston.

29. There was probable cause for the acts done by the defendant, Frank Scofield, Collector of Internal Revenue, acting pursuant to the orders and direction of the Commissioner of Internal Revenue.

## Conclusions of Law

■ 1. This Court has jurisdiction of the subject matter of and the parties to this case.

■ 2. I conclude that all the amounts of money borrowed for the purpose of making United States War Bond purchases as listed in Finding of Fact 12(6)–(11) herein were evidenced by notes and consequently constituted outstanding indebtedness of plaintiff evidenced by notes under the provisions of Internal Revenue Code, Sec. 719 (a) (1), defining borrowed capital.

3. I further conclude that said amounts of money borrowed, as listed in Finding of Fact 12(6)–(11) herein were borrowed in good faith and comprised instances of bona fide indebtedness of plaintiff under the provisions of Treasury Regulation 112 Sec. 35.719–1 further defining borrowed capital.

■ 4. I further conclude that the reasons such indebtednesses, namely said amounts borrowed by plaintiff for the purpose of purchasing War Bonds, as listed in Finding of Fact 12(6)–(11) were

incurred, were the reasons listed in Findings of Fact 14 through 19 herein, and I conclude that such reasons were business reasons within the scope of the term "business reasons" under provisions of Treasury Regulation 112 Sec. 35.719–1, defining borrowed capital, and I further conclude that such amounts borrowed as listed in Finding of Fact 12(6)–(11) were not borrowed merely to increase plaintiff's excess profits credit as prohibited under the provisions of Treasury Regulation 112 Sec. 35.719–1 if an item is to be includible as borrowed capital.

■ 5. I further conclude that the money borrowed by plaintiff during the taxable year 1944 for the purpose of purchasing War Bonds as mentioned in Finding of Fact 12(6)–(11) was part of plaintiff's borrowed capital under the provisions of Internal Revenue Code Sec. 719 (a) (1) and Treasury Regulation 112 Sec. 35.719–1, that such borrowed money was rightfully included by plaintiff in its corporate excess profits tax return in determining borrowed capital for computing its excess profits tax credit for the taxable year 1944, and that such borrowed money was wrongfully excluded by defendant in determining plaintiff's borrowed capital for computing its excess profits tax credit for the taxable year 1944.

■ 6. I further conclude that the $20,000.00 paid Mr. Hale M. Houston by plaintiff in 1946 as mentioned in Findings of Fact 27 and 28 herein was paid Mr. Houston as a salary and compensation for services actually rendered plaintiff by Mr. Houston during the year 1946.

7. I further conclude that said payment mentioned in Findings of Fact 27 and 28 herein and in Conclusion of Law 6 above was a reasonable allowance for salary and compensation to Mr. Houston during the year 1946 for the personal services mentioned in Finding of Fact 22 herein actually rendered plaintiff by Mr. Houston during the year 1946 under the provisions of Internal Revenue Code Sec. 23 (a) (1) (A), requiring that an allowance for salary or compensation to an employee of a business must be reasonable and given for

88

personal services actually rendered, in order for it to be deductible from the gross income of the business as a business expense.

8. I further conclude that said $20,000 paid Mr. Hale M. Houston by plaintiff during 1946 was rightfully included in its entirety by plaintiff in its corporate income tax return for the taxable year 1946 as a business expense and that $3,000 of said $20,000 payment was wrongfully excluded by defendant in computing plaintiff's deductible business expenses for the taxable year 1946.

9. By reason of the probable cause for the acts of the defendant or other officials of the United States Treasury Department, as found by the court, the judgment to be entered herein, upon becoming final shall be provided for and paid out of the proper appropriation from the Treasury of the United States.